ENTERED
CLERK, U.S. DISTRICT COURT

OCT 16 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

OCT 15 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SOUTHERN CALIFORNIA HOUSING RIGHTS CENTER, <br><br> Plaintiff, <br><br> v. <br><br> ROBERT KRUG, et al., <br><br> Defendants. | No. CV 06-1420-PLA <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO FED.R.CIV.P. 52** |

Based on the evidence presented at the non-jury trial of this action from June 18, 2007, through June 22, 2007, the Court finds as follows:

## FINDINGS OF FACT

**A.    Parties**

1.        Plaintiff Housing Rights Center ("HRC") is a non-profit corporation.  Its mission is to eliminate housing discrimination based on race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law.  [Testimony ("Test.") of Frances Espinoza at Trial Transcript ("Tr.") vol. 2, 110:17-18]

2.        Co-Defendants Krug Family Trust and David Hodgkinson own the subject property located at 714 W. Foothill Blvd., Monrovia, California. Robert Krug (husband) and Elizabeth Krug (wife) are sole trustees of the Krug Family Trust, which owns an undivided 50% interest in the subject property. Mr. Hodgkinson also owns an undivided 50% interest in the subject property. [Stipulated Fact No. 1]

3.        Defendants employ Barbara and Jerry Hebert as the subject property's on-site managers. Ms. Hebert primarily handles the rental process, while her husband primarily handles repairs. [Stipulated Fact No. 2]

4.        Of the various owners, Robert Krug has sole authority for setting policy for the subject property. [Test. of Krug at Trial Tr. vol. 5, 6:22-8:6, 10:25-11:7]

5.        The subject property is a 28-unit building, with 21 one-bedroom units and 7 two-bedroom units (one of these two-bedroom units is rented to Ms. Hebert). [Stipulated Fact No. 3]

6.        U.S. Census data shows that in 2000, approximately 40% of the rental units in the Monrovia area Census Tract in which the subject property lies were occupied by families with children. [Pl.'s Req. for Judicial Notice of Census Data at 3 (Order granted June 22, 2007)]

7.        Between November of 2002 when Ms. Hebert first became the on-site manager, through July of 2004, Ms. Hebert rented out 17 units. None of the 17 units rented during this twenty-month period was rented to a family with children. [Test. of Hebert at Trial Tr. vol. 4, 130:4-10, 181:20-182:16][1]

8.        In June of 2004, all of the tenants living in the 28-unit building were adults with the exception of two teenagers approximately 16 years of age, who had moved in prior to Ms. Hebert becoming the manager. [Test. of Hebert at Trial Tr. vol. 4, 185:4-11, 187:15-25, 188:6–20]

/

/

/

---

[1]        Ms. Hebert executed 18 lease agreements during that time, but one was for a unit transfer by an in-place tenant. That tenant did not have children. [Test. of Hebert at Trial Tr. vol. 4, 174:12-22]

**B.     HRC's Investigations**

9.      On March 10, 2004, Michelle Myrant -- a single mother with two young children -- contacted HRC to report that Ms. Hebert discouraged her from renting a vacant unit at the subject property due to her familial status.  [Plaintiff's Exhibit ("Pl.'s Ex.") 1 at HRC 0002-0007, 0012]

10.     Ms. Myrant called Ms. Hebert after learning of a vacancy at the subject property from an advertisement in the Pasadena Star News.  [Test. of Myrant at Trial Tr. vol. 3, 7:12-8:15, 11:17-22; Pl.'s Ex. 1 at HRC 0012]

11.     After Ms. Myrant told Ms. Hebert that she was looking for an apartment for herself and her two small children, Ms. Hebert told her that families with children are discouraged from moving into the subject property because there is no play area.  [Test. of Myrant at Trial Tr. vol. 3, 8:16-23; Pl.'s Ex. 1 at HRC 0012]

12.     Upon receipt of Ms. Myrant's complaint, HRC initiated an investigation into the policies and practices at the subject property.  HRC Case Analyst Joseph Plascencia coordinated five phone tests, three on-site tests, and one on-site survey while investigating the subject property.  [Test. of Plascencia at Trial Tr. vol. 2, 38:11-17; Pl.'s Exs. 1, 3-7, 10, 12]

13.     Ms. Myrant is not being compensated based on the results of this case.  [Test. of Myrant at Trial Tr. vol. 3, 12:2-4, 23:9-25:25]

14.     The testers' roles are to adopt their assigned profile -- either as a prospective tenant with small child or prospective tenant with adult roommate -- and report back what they observed during the course of the test.  [Test. of Plascencia at Trial Tr. vol. 2, 18:24-19:11].  At the time of the tests and at the time of trial, the testers were not aware of the allegations of the case, or what they were testing for.  [Test. of Carr at Trial Tr. vol. 1, 36:14-23; Test. of Duran at Trial Tr. vol. 1, 70:17-71:2; Test. of Gonzalez at Trial Tr. vol. 1, 108:25-109:9; Test. of Diaz at Trial Tr. vol. 1, 132:7-16; Test. of Nelson at Trial Tr. vol. 1, 157:6-16; Test. of Mollinedo at Trial Tr. vol. 2, 196:21-197:5; Test. of Field at Trial Tr. vol. 2, 160:19-161:2]

15.     Testers receive a stipend ($37 for on-site tests plus milage and $10 for telephone tests), for speaking to the rental agent, regardless of what is said or occurs during the test.  [Test. of Carr at Trial Tr. vol. 1, 21:19-24; Test. of Mollinedo at Trial Tr. vol. 2, 191:7-9]

3

16.      The testers' practice is to fill out reports and write narratives soon after finishing the test.  The reports contain basic information about renting a unit, such as the rental amount, security deposit, credit check fee, the lease agreement term, and the utilities that are included. [Test. of Mollinedo at Trial Tr. vol. 2, 195:12-17; Test. of Field at Trial Tr. vol. 2, 153:25–154:1; Test. of Diaz at Trial Tr. vol. 1, 136:7-12; Test. of Carr at Trial Tr. vol. 1, 18:1-6; Test. of Duran at Trial Tr. vol. 1, 58:24-59:11; Test. of Gonzalez at Trial Tr. vol. 1, 103:7-10; Test. of Nelson at Trial Tr. vol. 1, 142:21-143:1; Pl.'s Ex. 5 at HRC 0103, 0093]

17.      The practice of the testers was to call in to the Case Analyst after a test to be debriefed before the paperwork was filled out and returned. [Test. of Plascencia at Trial Tr. vol. 2, 25:20-25, 26:9-11]

18.      The first test was conducted by telephone on March 25, 2004, and involved *Testers A and B*.[2]  *Tester A* called Ms. Hebert at 4:02 p.m. and said that she was looking for a unit for herself and her six-year-old son.  Ms. Hebert responded that children are not allowed to play on the grounds of the complex because the building is not insured for that and the owner does not allow it.[3]  Ms. Hebert also volunteered to *Tester A* that there are no families with children living in the building.  [Test. of Mollinedo at Trial Tr. vol. 2, 193:13-195:11; Pl.'s Ex. 3 at HRC 0127-28]

19.      *Tester B*[4] called at 4:12 p.m. posing as a tenant looking for a unit for herself and her adult sister.  *Tester B* asked Ms. Hebert if the units were large enough for herself and her sister,

---

[2]   Testers were referred to during trial by letters instead of their actual names in order to protect their identities from the general public, so that the testers can continue to play the role of prospective tenants in other fair housing investigations without being discovered as undercover testers.

[3]   Defendants do not have a rule against children playing at the property, though such a rule was stated to Testers A, E, G, and J after each tester volunteered that they had a small child. [Test. of Hebert at Trial Tr. vol. 4, 163:9-164:3; Pl.'s Ex. 15; Test. of Mollinedo at Trial Tr. vol. 2, 192:18-24, 194:5-25; Pl.'s Ex. 3 at HRC 128; Test. of Nelson at Trial Tr. vol. 1, 152:14-153:6; Pl.'s Ex. 5 at HRC 106; Test. of Duran at Trial Tr. vol. 1, 66:23-68:1; Pl.'s Ex. 6 at HRC 82, 85; Test. of Field at Trial Tr. vol. 2, 159:7-160:13; Pl.'s Ex. 10 at HRC 62]

[4]   The same person played the roles of *Testers B* and *H*.  One person also played the roles of both *Testers D* and *G*.

4

and Ms. Hebert replied that she thought they would be.  Ms. Hebert proceeded to provide information to *Tester B* regarding an available unit. [Test. of Plascencia at Trial Tr. vol. 2, 24:11-12; Test. of Diaz at Trial Tr. vol. 1, 127:17-128:24; Pl.'s Ex. 3 at HRC 0125-26, 0132]

20.     The second test on March 25, 2004, was also a telephone test and involved *Testers C* and *D*. *Tester C* called Ms. Hebert around 4:55 p.m. and said that she was looking for an apartment for herself and her five-year-old son.  Ms. Hebert asked the age of her son and the tester replied that he is five.  Ms. Hebert then stated that there were no children in the building, only adults.  She also recommended that the tester inquire as to vacancies at the building next door because it is a "family building" and less expensive. [Test. of Gonzalez at Trial Tr. vol. 1, 105:7-107:18; Pl.'s Ex. 4 at HRC 0117-19]

21.     *Tester D* contacted Ms. Hebert and stated that she was looking for a unit for herself and her adult sister.  In the course of conversation between *Tester D* and Ms. Hebert, Ms. Hebert stated that there were "no children, just adults, so it's super quiet." [Test. of Duran at Trial Tr. vol. 1, 63:20-65:11; Pl.'s Ex. 4 at HRC 0113-14]

22.     The third test was an on-site test conducted on March 27, 2004, and involved *Testers E* and *F*.  *Tester E* met Ms. Hebert at approximately 10:30 a.m. and asked about an apartment for herself and her six-year-old grandson.  Ms. Hebert hesitated and then said with very little enthusiasm, "There are no children here.  He would not be able to play outside."  Ms. Hebert volunteered little more during *Tester E*'s visit, except to suggest that the tester consider the building next door, which had a vacant two-bedroom unit. (Later, HRC instructed this tester to call Ms. Hebert to find out to which property she was referring. On April 20, 2004, the tester called Ms. Hebert and was told that the building at 712 Foothill Boulevard accepted children and permitted them to play). [Test. of Nelson at Trial Tr. vol. 1, 152:6-154:9, 156:7-16; Pl.'s Ex. 5 at HRC 0102-06]

23.     At 11:00 a.m., *Tester F* arrived and posed as a prospective tenant with an adult relative.  She inquired of Ms. Hebert regarding the availability of a unit.  For *Tester F*'s visit, Ms. Hebert pointed out the positive features of the property and gave the tester a tour of the building's amenities.  Toward the end of that conversation, Ms. Hebert stated: "This building is in a nice,

1 | quiet neighborhood. It's quiet like this all the time, there's no kids." [Test. of Carr at Trial Tr. vol.
2 | 1, 34:3-35:24; Pl.'s Ex. 5 at HRC 0092-98]

3 |  24.  The fourth test, on April 10, 2004, was an on-site test at the subject property involving

4 | *Testers G* and *H*. *Tester G* arrived at the subject property at 11:05 a.m. and told Ms. Hebert that

5 | she was looking for an apartment for herself and her 8-year-old granddaughter. Ms. Hebert

6 | immediately asked the age of her granddaughter and when *Tester G* responded, Ms. Hebert

7 | volunteered that while she does take children, there were no children living in the complex and that

8 | children are not allowed to play in the complex. Ms. Hebert also stated that most of the tenants

9 | were single, and some of the male tenants have their children on the weekends but she does not

10 | see them. Ms. Hebert showed one apartment unit to this tester with a child. [Test. of Duran at Trial

11 | Tr. vol. 1, 66:11-69:4; Pl.'s Ex. 6 at HRC 0078-82]

12 |  25.  At 11:30 a.m., Ms. Hebert met with *Tester H*, who posed as having an adult relative.

13 | *Tester H* was shown the one-bedroom unit viewed by *Tester G*, as well as an additional vacant

14 | unit at the complex that was not shown to *Tester G*. Ms. Hebert also volunteered to the tester that

15 | everyone living at the subject property was an adult. [Test. of Diaz at Trial Tr. vol. 1, 129:10-

16 | 131:24; Pl.'s Ex. 6 at HRC 0070-74]

17 |  26.  Between the fourth and fifth tests, HRC conducted an on-site survey at the property.

18 | On May 10, 2004, HRC sent *Tester I* to survey the tenants at the subject property. A surveyed

19 | tenant stated that Ms. Hebert told him when he was applying to rent that there were no children

20 | living in the complex. Ms. Hebert also had a conversation directly with *Tester I*. She asked him

21 | what he was doing there and then gave him permission to continue the survey. *Tester I* asked Ms.

22 | Hebert if there were families with children living in the complex. Ms. Hebert stated that there were

23 | no children in the complex. She also said that the one-bedroom units were too small for children

24 | and that most of the tenants were older people with no children. [Test. of Plascencia at Trial Tr.

25 | vol. 2, 38:15-40:15, 75:20-76:4, 91:10-23; Test. of Hebert at Trial Tr. vol. 4, 156:5-157:11]

26 |  27.  Following this survey, Ms. Hebert had a conversation with Mr. Krug about the

27 | investigation, and then Mr. Krug contacted his attorney, Peter Kaplanis. Mr. Kaplanis had a

28 |

conversation with HRC's Case Analyst in early June 2004 and also sent HRC two letters on July 14 and 15, 2004. [Test. of Plascencia at Trial Tr. vol. 2, 47:18-48:7, 48:17-49:7; Pl.'s Ex. 9]

28.     *Tester J* visited the complex at 10:45 a.m. on November 6, 2004, and posed as a prospective tenant with a six-year-old son. On the way to viewing an available unit, Ms. Hebert pointed to a common area in the complex and stated, "He [the child] can't play down there because there is no room." [Test. of Field at Trial Tr. vol. 2, 159:7-160:13; Pl.'s Ex. 10 at HRC 0058-62]

29.     At 11:32 a.m. on November 6, 2004, *Tester K* arrived posing as a prospective tenant with an adult sister. *Tester K* was shown an available unit. Ms. Hebert stated to this tester that a lady with a child wanted to moved in, but she told her that the building is very quiet, mostly all adults, and that a child running around would not be happy living in this building. [Test. of Mason at Trial Tr. vol. 2, 172:12-24, 173:24-174:3; Pl.'s Ex. 10 at HRC 0049-54]

30.     When testers posing as prospective tenants with children were asked at trial if they felt unwelcome to rent at the subject property as a result of Ms. Hebert's comments and conduct, they responded yes. [Test. of Gonzalez at Trial Tr. vol. 1, 107:19-108:16; Test. of Nelson at Trial Tr. vol. 1, 154:10-17]

31.     Mr. Plascencia testified that on July 2, 2004, he received a phone call from Charlene Francone, the on-site manager at Mr. Krug's next door property at 718-720 West Foothill. Ms. Francone told him her name, her role as the manager of 718-720 West Foothill, that her property had the same owner, that she knew Ms. Hebert personally, that the property applied a 2+1 occupancy rule, and that she had been the manager for seven years.  She also told Mr. Plascencia that she'd had a conversation with Ms. Hebert where Ms. Hebert admitted she told prospective tenants their children could not play in the complex. [Test. of Plascencia at Trial. Tr. vol. 2, 43:2-46:16; Pl's Ex. 8 at HRC 0372]  Ms. Francone testified that she could not recall speaking with Mr. Plascencia or calling the HRC. She also testified that Ms. Hebert never told her she was telling prospective tenants that children would not be allowed to play outside, or that she was discouraging tenants with children. [Test. of Francone at Trial Tr. vol. 4, 123:12-19, 125:10-16]

32.　　　Plaintiff sent Defendants a November 16, 2004, demand letter in an attempt to achieve a pre-litigation resolution to this matter. [Stipulated Fact No. 5] [Pl.'s Ex. 14]

33.　　　On December 28, 2004, HRC provided Defendants' attorney, Mr. Kaplanis, with the testing documents related to this case on the parties' agreement that Mr. Krug would keep the contents of the information contained therein confidential, which he has. [Stipulated Fact No. 7]

34.　　　Plaintiff HRC and Defendants negotiated over the course of sixteen months but were unable to reach a resolution of this matter. [Test. of Espinoza at Trial Tr. vol. 4, 77:3-6]

35.　　　During the course of the pre-litigation negotiations, HRC offered to waive its attorney's fees and costs in a January 2005 letter in return for a settlement with a consent decree. [Test. of Espinoza at Trial Tr. vol. 4, 77:7-19]

36.　　　Defendants refused to settle in part because they did not want to enter into a consent decree. According to Defendants' attorney, Peter Kaplanis, Defendants felt that the consent decree was equivalent to having a judgment entered against them. [Test. of Kaplanis at Trial Tr. vol. 4, 119:18-120:4]

37.　　　On March 3, 2006, HRC filed a complaint in this case, which was later amended to include co-owner David Hodgkinson. [Stipulated Fact No. 8]

## C.　　Lack of Children at Defendants' Property

38.　　　Defendants had seven tenants with children testify at trial. Two moved in prior to Ms. Hebert becoming the manager. The other five rented their units from Ms. Hebert in or after December 2004; HRC sent its demand letter detailing the allegations of the complaint and HRC's testing evidence on November 16, 2004. [Test. of Wheeler at Trial Tr. vol. 3, 49:16-24; Test. of Villaflor at Trial Tr. vol. 3, 57:7-58:2; Test. of Hernandez at Trial Tr. vol. 3, 63:23-64:2; Test. of Liu at Trial Tr. vol. 3, 72:16-20; Test. of Kurup at Trial Tr. vol. 3, 79:24-80:2; Test. of Yvanez at Trial Tr. vol. 3, 85:18-86:11; Test. of Nuguid at Trial Tr. vol. 4, 143:21-144:13; Test. of Hebert at Trial Tr. vol. 4, 160:3-6, 181:12-182:16]

39.　　　Between November of 2002, when Ms. Hebert first became the on-site manager, through July of 2004, Ms. Hebert rented out 17 units. None of the 17 units rented during this twenty-

1  month period was rented to a family with children. [Test. of Hebert at Trial Tr. vol. 4, 130:4-10,

2  181:20-182:16]

3     40.     Ms. Hebert testified at trial that Defendants had always had children living in their

4  units.  She testified that since there were always children at the building, she would never tell

5  prospective tenants that the building was all adults.  [Test. of Hebert at Trial Tr. vol. 4, 138:9-

6  141:22]

7     41.     In June of 2004, during HRC's investigation, all of the tenants living in the building

8  were adults with the exception of a family with a 16-year-old and a family with a 15 or 16-year-old.

9  These two families were already tenants when Ms. Hebert took over as the manager -- Ms. Hebert

10  did not rent to these families with minor children.  [Test. of Hebert at Trial Tr. vol. 4, 185:4-11,

11  187:15-25, 188:6-20]

12     42.     Ms. Hebert admitted that no small children lived at the building in June 2004. [*Id.*]

13     43.     Mr. Krug testified that he was aware of these 17 units being let and he knew that none

14  of the units was rented to a family with children.  [Test. of Krug at Trial Tr. vol. 5, 34:19-36:21]

15

16  **D.    Mr. Krug's Involvement in This and Two Prior Complaints of Discrimination by**

17  **Prospective Tenants with Children**

18     44.     On two prior occasions, prospective tenants with children have filed fair housing

19  complaints against Defendants after they were allegedly refused the opportunity to rent a dwelling

20  at the subject property because of their familial status. [Test. of Espinoza at Trial Tr. vol. 2, 132:7-

21  135:3; Test. of Krug at Trial Tr. vol. 5, 17:24-18:1, 40:7-41:10]

22     45.     In 1986, the California Department of Fair Employment and Housing investigated

23  a complaint of alleged familial status discrimination by Defendant Robert Krug. [Test. of Espinoza

24  at Trial Tr. vol. 2, 133:2-5; Test. of Krug at Trial Tr. vol. 5, 40:1-41:10]

25     46.     As a result of this complaint, Mr. Krug agreed to change their occupancy limits.

26  [Test. of Krug at Trial Tr. vol. 5, 17:24-19:21, 40:19-20]

27

28

47.     In 2001, HRC (known at that time as the Fair Housing Council of San Gabriel Valley) received a complaint from a prospective tenant based on familial status. [Test. of Espinoza at Trial Tr. vol. 2, 132:7-21; Test. of Krug at Trial Tr. vol. 5, 17:24-19:21, 40:24-41:10]

48.     As a result of HRC's investigations into this complaint, the Krugs agreed to change their occupancy limits, but did not attend or have the managers of the property attend fair housing training, as HRC had requested. [Test. of Espinoza at Trial Tr. vol. 2, 132:22-133:1; Test. of Krug at Trial Tr. vol. 5, 17:24-19:21, 41:6-10]

49.     In the instant case, upon learning of HRC's investigation, Mr. Krug discussed the allegations with Ms. Hebert. He then spoke to his attorney. He neither interviewed tenants (or instructed his attorney to do so), nor reviewed rent rolls (or instructed his attorney to do so). In addition, he was aware of the composition of families with children in the building, i.e., that there were no small children (under age 16) at the building. He was also aware that Ms. Hebert had rented to 17 new tenants in a 20-month period, but none were families with children. Finally, he never instructed Ms. Hebert to do anything different, or to change the rules in any way. [Test. of Krug at Trial Tr. vol. 5, 25:18-26:11, 35:12-36:21, 41:24-43:1]

## FINDINGS RE: RELIEF SOUGHT BY HRC

**A.     Injunctive Relief**

50.     Where a fair housing violation has occurred, "a district court has broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs." *Atkins v. Robinson*, 545 F.Supp. 852, 889 (E.D. Va. 1982), *judgment aff'd*, 733 F.2d 318 (4th Cir. 1984); *see also Davis v. Mansards*, 597 F. Supp. 334, 348 (N.D. Ind. 1984) (explaining that when granting comprehensive injunctive relief "[t]he public interest in abolishing [] discrimination dictates that the defendants be held to a continuing high standard of fair dealing.").

/

/

/

51.     "Injunctive relief should be structured to achieve the twin goals of insuring that the [Fair Housing] Act is not violated in the future and removing any lingering effects of past discrimination." *Marable v. Walker*, 704 F.2d 1219, 1221 (11th Cir. 1983).

52.     HRC seeks injunctive relief, including: (1) entry of an injunction that Defendants no longer discriminate; (2) training of Defendants' management and building staff on fair housing laws; (3) display of fair housing placards and brochures in all rental offices and at all buildings; (4) display of Equal Opportunity logo (or statement to that effect) on all advertisements for rental properties; (5) monitoring of Defendants' application process, rental decisions and eviction procedures; and (6) adoption of written procedures on rental process and fair housing policy to be distributed to all staff and tenants.

53.     The Court finds that injunctive relief, as set forth below, is necessary to ensure that Defendants stop discriminating against families with children and to ensure that all prospective and in-place tenants who come in contact with Defendants are aware of their right not to be discriminated against on the basis of their familial status.

54.     HRC requests that the term of the injunctive relief be five years.  The Court finds that a three-year term for injunctive relief will meet the twin goals of ensuring that Defendants do not violate the FHA in the future and removing the effects of past discrimination.  The Court reaches this conclusion based in part on the evidence that since December, 2004, i.e., for nearly three years now, Defendants have rented units to tenants with children, and there is no evidence that they have refused to do so since that time.

## B.     Diversion of Resources Damages

55.     The Court finds that as a result of Defendants' discriminatory activities, HRC was forced to invest significant resources into investigating the subject property.  The time and money invested in testing, surveying, and otherwise investigating the subject property resulted in a diversion of resources from HRC's other activities. [Test. of Espinoza at Trial Tr. vol. 2, 116:13-17, 119:14-120:13]

56.     HRC Case Analyst Joseph Plascencia spent almost 25 hours investigating the subject property for familial status discrimination. Mr. Plascencia spent 4.8 hours of that time on non-surveying and non-testing activities, including conducting an intake on Ms. Myrant, communicating with Defendants' agents and representatives, meeting with supervisors, conducting research such as property title searches, and visiting the subject property. Mr. Plascencia's staff hourly rate is $19.74 per hour, which is equivalent to his hourly salary rate of $15.04 ($31,283 yearly salary divided by 2080 working hours a year) plus an overhead rate of $4.70. Altogether, HRC spent $90.80 in terms of Mr. Plascencia's staff time. [Test. of Plascencia at Trial Tr. vol. 2, 17:4-18:1; Pl.'s Ex. 1; Test. of Espinoza at Trial Tr. vol. 2, 124:3-14, 136:11-137:10, vol. 4, 5:14-22, 88:18-25]

57.     The cost of performing an on-site test is $1,000, including the time spent by the Case Analyst in coordinating the test and analyzing the results; two tester stipends ($37 per tester) plus mileage; the costs of the vacancy check; the costs associated with recruiting, training, and maintaining the testers; and the costs associated with developing and refining test forms, policies, and procedures. [Test. of Espinoza at Trial Tr. vol. 2, 120:7-13, vol. 4, 56:21-24, 57:18-25, 69:8-70:5, 79:13-18; Pl.'s Ex. 6 at HRC 0223]

58.     The cost of performing a telephone test is $500.  The cost of a telephone test includes the time spent by the Case Analyst in coordinating the test and analyzing the results; two tester stipends ($10 per tester); the costs of the vacancy check ($10 if conducted by a tester); the costs associated with recruiting, training, and maintaining the testers; and the costs associated with developing and refining test forms, policies, and procedures. [Test. of Espinoza at Trial Tr. vol. 2, 120:7-13, 138:14-20, vol. 4, 18:9-20, 69:8-70:5; Pl.'s Ex. 3 at HRC 0233; Pl.'s Ex. 5 at HRC 0222]

59.     HRC conducted one on-site survey at the subject property.  The cost of performing a survey is $1,000. The cost of performing a survey includes the time spent by the Case Analyst in creating the survey questions and coordinating the survey; the time and development costs for analyzing the results and following up with tenants; the $20-$50 stipend to the tester performing the survey; the costs associated with recruiting, training, and maintaining volunteers to perform

1   surveys; and the costs associated with developing and refining the survey forms, policies, and

2   procedures. [Test. of Espinoza at Trial Tr. vol. 2, 7:8-8:2, 40:7-41:12, 120:7-13, vol. 4, 29:23-25,

3   56:21-24, 69:8-70:5, 71:7-20; Pl.'s Ex. 7 at HRC 42-48, 211]

4       60.      HRC invests substantial resources into its testers and its tester program, which is

5   reflected in the costs of the tests and surveys. HRC spends a minimum of well over a hundred

6   hours a year in efforts to recruit testers. HRC constantly gives out literature in the community and

7   runs approximately 15 recruitment booths at community events during the year, throughout Los

8   Angeles and Ventura counties. Each booth requires an average of 5.5 staff hours to man the

9   booth and commuting time. HRC spends about two to four hours of staff time to develop tester

10   recruitment fliers. HRC also spends about two to four hours to develop media advertisements to

11   recruit testers, and then further development time for each additional advertisement. About nine

12   advertisements are placed per year, one for each tester training. [Test. of Espinoza at Trial Tr.

13   vol. 2, 120:7-16, vol. 4, 10:24-11:2, 14:10-18, 20:3-25, 58:22-64:5, 69:8-70:5]

14       61.      In addition to the staff time, HRC spends approximately $3,000 a year to recruit

15   testers. This includes the costs of placing an ad, such as $166.60 for a two-day ad. It also

16   includes the cost of renting booths, which can range between $75 to more than $350. [Test. of

17   Espinoza at Trial Tr. vol. 4, 10:24-11:2, 14:10-18, 20:3-25, 58:22-64:5, 69:8-70:5]

18       62.      HRC invests substantial resources in training and maintaining a pool of skilled

19   testers. HRC conducts nine tester trainings per year, for both newly recruited testers and current

20   testers. Each tester training requires 15 hours of staff time -- five hours of staff time from three

21   staff -- as well as advance preparation, and site preparation, including ordering and paying for

22   food. HRC arranges trainings in outlying regions, such as the Antelope Valley, where staff must

23   commute to. [Test. of Espinoza at Trial Tr. vol. 4, 64:6-65:17]

24       63.      In addition to the staff time, HRC spends hundreds of dollars a year to train testers.

25   HRC spends approximately $240 a year in paying trainees to take practice tests before they can

26   become testers. HRC also rents training sites, which can cost approximately $125-$150 per

27   training. HRC pays for dinner for trainees and staff. HRC also pays staff for mileage for trainings

28   in places like the Antelope Valley. [Test. of Espinoza at Trial Tr. vol. 4, 19:16-20:1, 64:6-65:17]

64.        HRC invests substantial resources in developing and maintaining its testing program. HRC uses a manual for tester training; this manual was created by HRC, and is updated constantly by both the Executive Director and Director of Investigations. This manual contains testing protocols and practices, which were also created and have been revised by HRC. In addition, the report forms that testers use were created and are updated by HRC, as are test analysis forms that HRC staff use to analyze tester reports. [Test. of Espinoza at Trial Tr. vol. 4, 65:18-67:3]

65.        The staff time and expenses associated with recruiting, training, and maintaining testers, and developing and improving the tester program are all encompassed in the costs of the tests and surveys. [Test. of Espinoza at Trial Tr. vol. 2, 120:7-16]

66.        Courts do not require fair housing organizations to calculate an exact figure down to the penny to grant compensatory damages for the tasks the organizations perform when investigating a case. *See, e.g., Chicago v. Matchmaker Real Estate Sales Center*, 982 F.2d, 1086, 1099 (7th Cir. 1992) (affirming lower court's compensatory damages to fair housing organization of a set fee of $3,000 for past audits, $5,000 for expected monitoring costs, and $6,000 for continued auditing).

67.        The Court finds that HRC is entitled to **$6,590.80** in diversion of resource damages. This includes $90.80 for Mr. Plascencia's staff time, $2,500 for five telephone tests, $3,000 for three on-site tests, and $1,000 for one survey.

## C.    Frustration of Mission Damages

68.        In order to stop Defendants' discriminatory practices and counteract the effects of these practices in the community, the Court finds that HRC will need to invest significant resources into monitoring the subject property and conducting education and outreach. The time and money needed to monitor the subject property and to conduct outreach and education is HRC's frustration of mission damages. [Test. of Espinoza at Trial. Tr. vol. 2, 125:15-21, 126:8-12, 127:10-128:5]

69.        To monitor the property and ensure that Defendants are no longer discriminating against families with children, HRC will conduct quarterly on-site tests, which cost HRC $1,000 per

1    test.  HRC must conduct quarterly tests to ensure that Defendants stop their discrimination

2    permanently and so it does not reoccur. [Test. of Espinoza at Trial. Tr. vol. 2, 120:1-16, 126:11-

3    19]

4        70.        HRC will also monitor the property by conducting an on-site survey of tenants every

5    year at $1,000 per survey.  Surveys allow HRC to interview in-place tenants to see the

6    composition of the building, identify if there are any families with children who have moved in, and

7    to find out if any families with children have experienced discrimination at the building. [Test. of

8    Espinoza at Trial Tr. vol. 2, 126:20-24]

9        71.        HRC will educate the in-place tenants at the subject property by mailing them

10   brochures about HRC and familial status discrimination. The total cost of these mailings is $63.44,

11   which include the costs of the postage, the brochures, and staff time. [Test. of Espinoza at Trial

12   Tr. vol. 2, 128:11-15]

13       72.        HRC will conduct an annual tenant fair housing workshop.  The workshop will

14   target not only the in-place tenants, but residents who live in the nearby area who are the most

15   likely to have interacted with Defendants and been discriminated against. The workshop will cost

16   $1,000, which includes the cost of renting a community space, advertising the workshop in the

17   Pasadena Star News and local public places, sending mailings to tenants, and the staff time to

18   conduct the workshop. [Test. of Espinoza at Trial Tr. vol. 2, 127:10-128:10, vol. 4, 41:12-42:2]

19       73.        HRC will also train all four Defendants as well as Jerry Hebert, the other on-site

20   manager at the subject property, on the fair housing laws.  HRC's fair housing management

21   course is $125 per person. [Test. of Espinoza at Trial Tr. vol. 2, 128:18-129:12]

22       74.        HRC will place a monthly fair housing advertisement in the Pasadena Star News to

23   educate the public on fair housing, at the cost of $250 per month.  Because Defendants had

24   previously placed ads in the Pasadena Star News to reach prospective tenants, the purpose of

25   the fair housing ads would be to educate those same individuals who would have contacted

26   Defendants in response to the ad and been discriminated against. [Test. of Espinoza at Trial Tr.

27   vol. 2, 129:21-22, vol. 4, 46:12-47:16]

28

1   75.    The annual cost of these monitoring, outreach, and education activities is $9,688.44.

2   [Test. of Espinoza at Trial Tr. vol. 2, 130:8-10]

3   76.    The frustration of mission damages equals $9,688.44 per year for three years, or

4   $29,065.32 in total.  [Test. of Espinoza at Trial Tr. vol. 2, 130:8-22]

5   77.    Altogether, the Court will award HRC **$35,656.12** in compensatory damages for

6   diversion of resources and frustration of mission damages.

7   78.    All conclusions of law that are deemed to be undisputed facts are incorporated

8   herein.

9

10   **CONCLUSIONS OF LAW**

11   79.    Fair housing agencies like HRC have broad standing to assert claims under the FHA

12   based on the discrimination experienced by other individuals, including testers posing as

13   prospective tenants.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *Fair*

14   *Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002), *cert. denied*, 537 U.S. 1018 (2002);

15   *Walker v. City of Lakewood*, 272 F.3d 1114, 1123 (9th Cir. 2001); *Trafficante v. Metropolitan Life*

16   *Ins. Co.*, 409 U.S. 205, 212 (1972); *Smith v. Pacific Properties and Development Corp.*, 358 F.3d

17   1097, 1102-04 (9th Cir. 2004).

18   80.    In *Havens*, the Supreme Court found that since the defendants' discrimination

19   "perceptibly impaired [a fair housing organization's] ability to provide housing counseling and

20   referral services for low- and moderate-income homeseekers, there can be no question that the

21   organization has suffered injury in fact.   Such concrete and demonstrable injury to the

22   organization's activities -- with the consequent drain on the organization's resources -- constitutes

23   far more than simply a setback to the organization's abstract social interests."  *Havens*, 455 U.S.

24   at 379.

25   81.    In *Fair Housing of Marin County*, the Ninth Circuit found that the organization had

26   standing because "it showed a drain on its resources from both a diversion of its resources and

27   frustration of its mission."  *Fair Housing of Marin*, 285 F.3d at 905.  In *Marin*, the fair housing

28

1 | organization was the sole plaintiff and it conducted only two sets of tests during its investigations.

2 | *Id.* at 902.

3 |     82.      In *Walker*, the Ninth Circuit reiterated the fair housing organization's standing and

4 | explained that "Congress intended standing under [the FHA] to extend to the full limits of Art[icle]

5 | III and that courts accordingly lack the authority to create prudential barriers to standing in suits

6 | brought under that [statute]." *Walker*, 272 F.3d at 1123, *citing Havens*, 455 U.S. at 372 (brackets

7 | in original; internal quotations omitted).

8 |     83.      Where a fair housing agency conducts tests or other investigatory measures to

9 | identify unlawful housing discrimination, the agency suffers a redressable injury in court because

10 | its resources have been diverted and its mission to eliminate housing discrimination has been

11 | frustrated. *Havens*, 455 U.S. at 379; *Fair Housing of Marin*, 285 F.3d at 905.

12 |     84.      Under traditional principles of vicarious liability, which apply to the federal FHA, a

13 | principal is liable for the discriminatory actions and statements of his or her agent done within the

14 | scope of the agent's apparent authority. *Holley v. Crank*, 400 F.3d 667, 670-71 (9th Cir. 2005).

15 | Ms. Hebert is the on-site manager of the subject property whose role includes showing and renting

16 | units to prospective tenants.

17 |     85.      Co-Defendants Robert Krug, Elizabeth Krug, and Mr. Hodgkinson, all of whom

18 | owned the property and for whom Ms. Hebert worked, are vicariously liable for Ms. Hebert's

19 | discriminatory acts because she was acting in her role as an agent as she showed available units

20 | at the property. *Id.; Harris v. Itzhaki,* 183 F.3d 1043, 1054 (9th Cir. 1999).

21 |     86.      Thus, the Defendants are jointly and severally liable for Ms. Hebert's fair housing

22 | violations. *See Fair Housing Congress v. Weber*, 993 F.Supp. 1286, 1293-94 (C.D. Cal. 1997).

23 |     87.      The Court must give the FHA "generous construction to carry out a policy that

24 | Congress considered to be of the highest priority." *Holley*, 400 F.3d at 674 (quoting *Trafficante*,

25 | 409 U.S. at 211-12 (internal quotations omitted)).

26 |     88.      It is unlawful under the FHA for a housing provider to discriminate in the rental of a

27 | dwelling based on familial status.  42 U.S.C. § 3601, *et seq.*

28 |

89.     "Familial status" is defined to include one or more individuals under age 18 residing with a parent or another person having legal custody of such individual.  42 U.S.C. § 3602(k).

90.     Familial status discrimination specifically includes discrimination against families with small children. *See Weber*, 993 F. Supp. at 1293-94 (finding that manager's policy not to rent second-floor units to families with small children was familial status discrimination under the FHA); *see also Drenik v. Ohanesian*, 2006 WL 2354708, at *2 (E.D. Cal. August 14, 2006).

91.     Section 3604(a) makes it unlawful for a housing provider to refuse to rent a dwelling or otherwise make unavailable or deny a dwelling to any person based on familial status. 42 U.S.C. § 3604(a).

92.     Section 3604(a)'s language of "otherwise make unavailable" appears "to be as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful." *United States v. Youritan Construction Co.,* 370 F. Supp. 643, 648 (N.D. Cal. 1973); *see also Housing Rights Center v. Sterling*, 404 F.Supp.2d 1179, 1190 (C.D. Cal. 2004) ("§ 3604(a) also prohibits actions that make apartments *effectively* unavailable") (emphasis in original).

93.     Department of Housing and Urban Development ("HUD") regulations interpreting the FHA state that a housing provider discriminates under Section 3604(a) by:

     1) Discouraging any person from inspecting, purchasing or renting a dwelling because of . . . familial status . . . or because of the . . . familial status . . . of persons in a community, neighborhood or development.

     2) Discouraging the purchase or rental of a dwelling because of . . . familial status . . . by exaggerating drawbacks or failing to inform any person of desirable features of a dwelling or of a community, neighborhood, or development.

     3) Communicating to any prospective purchaser that he or she would not be comfortable or compatible with existing residents of a community, neighborhood or development because of . . . familial status . . . .

1   24 C.F.R. § 100.70(c)(1)-(3) (interpreting 42 U.S.C. § 3604(a)).  See also *Fair Housing Congress*,

2   993 F. Supp. at 1293; *Harris*, 183 F.3d at 1053.

3       94.       HUD's interpretation of the FHA is entitled to substantial deference.  *See Auer v.*

4   *Robbins*, 519 U.S. 452, 461 (1997) (stating an agency's interpretation of its own regulation is

5   entitled to substantial deference unless it is "plainly erroneous or inconsistent with the regulation");

6   *accord Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843-44 (1984);

7   *Harris*, 183 F.3d at 1051.

8       95.       The Court concludes that HRC has shown by a preponderance of the evidence that

9   Defendants violated Section 3604(a) when they discouraged Ms. Myrant and HRC's testers with

10   small children from renting a unit at the subject property.  Ms. Hebert told the testers that children

11   could not play at the building, there were no children living at the building, there was no area

12   where children could play, the building was not insured for children, and the units were too small

13   for families with children.  As a result, Ms. Myrant and other prospective tenants with children were

14   discouraged from applying for a unit based on their familial status.  *Id.* at ¶ 9-11, 18-30.

15       96.       Attempting to "steer" families with children away from particular buildings or areas

16   also violates Section 3604(a).  24 C.F.R. § 100.70(c)(4); *see also United States v. Plaza Mobile*

17   *Estates*, 273 F.Supp.2d 1084, 1090-91 (C.D. Cal. 2003).

18       97.       The Court concludes that HRC has shown by a preponderance of the evidence that

19   Defendants violated Section 3604(a) when they attempted to steer Testers C and E posing as

20   prospective tenants with small children away from the subject property by suggesting that they

21   look into the "family building" next door.  *Id.* at ¶ 20, 22.

22       98.       Section 3604(c) makes it unlawful for a housing provider to make any statement with

23   respect to the rental of a dwelling that indicates any preference, limitation, or discrimination to any

24   person based on familial status.  42 U.S.C. § 3604(c).

25       99.       The standard for whether a statement violates Section 3604(c) is whether it "would

26   discourage an ordinary reader of a particular [protected group] from applying for an apartment

27   . . . or would suggest to an ordinary [reader] that people [of a particular protected group] are

28   preferred or dis-preferred for the housing in question."  *Housing Rights Center v. Donald Sterling*

1 | *Corp.*, 274 F. Supp. 2d 1129, 1137-38 (C.D. Cal. 2003), *aff'd, Housing Rights Center v. Sterling,*

2 | 84 Fed. Appx. 801 (9th Cir. 2003) (brackets in original; internal quotations and citations omitted);

3 | *see also Janick v. HUD,* 44 F.3d 553, 556 (7th Cir. 1995).  Thus, statements violating Section

4 | 3604(c) require no discriminatory intent on the part of the speaker.  *Id.; accord White v. HUD,* 475

5 | F.3d 898, 905-06 (7th Cir. 2007).

6 |      100.     Using words or phrases to convey that a dwelling is not available to a particular

7 | group of persons because of familial status and expressing to prospective renters or any other

8 | persons a preference or a limitation on any renter because of familial status violates Section

9 | 3604(c).  *White,* 475 F.3d at 905-06.

10 |      101.     The Court concludes that HRC has shown by a preponderance of the evidence that

11 | Ms. Hebert's discouraging comments to Ms. Myrant and the testers with children violated Section

12 | 3604(c) by indicating a preference not to rent to families with children.  In addition, Ms. Hebert

13 | made comments suggesting a preference to rent to adults only, such as that the building was

14 | "super quiet" because it was just adults, and that the building was "nice, quiet" because there were

15 | no kids.  These comments would suggest to an ordinary listener that Defendants preferred to rent

16 | to adults only, and not to families with children.  *Id.* at ¶ 21, 23.

17 |      102.     Although the testers were not told the nature of the allegations concerning the

18 | property prior to conducting their tests, the profiles of those testers with small children would

19 | certainly suggest to them the nature of the claim.  Nevertheless, on balance, and when coupled

20 | with the evidence that Ms. Hebert did not rent to any families with children from 2002 through

21 | 2004, the Court finds that the testers were credible in their testimony that Ms. Hebert made

22 | statements that discouraged individuals with small children from renting at the subject property,

23 | that she attempted to steer families with children away from the subject building, and that her

24 | comments indicated a preference not to rent to families with children.

25 |      103.     Based on the evidence presented at trial, the Court does <u>not</u> find a violation of

26 | Section 3604(d), which makes it unlawful for a housing provider to misrepresent the availability

27 | of a dwelling to any person based on familial status.  42 U.S.C. § 3604(d).

28 |

1    104.    The FHA provides for compensatory damages, punitive damages, and equitable

2    relief.  42 U.S.C. § 3613(c).

3    105.    The Court concludes that HRC has shown by a preponderance of the evidence that

4    as a result of Defendants' discriminatory actions, Plaintiff HRC has suffered damages.

5    106.    Under the collateral source rule, HRC's damages for Defendants' discrimination

6    should not be offset by government grants received by the plaintiff-organization to fulfill its mission

7    of educating public about fair housing laws, because "the grant was not awarded to compensate

8    [the fair housing organization] for the costs it incurred counteracting defendant's discriminatory

9    practices" and a "tort award should not be offset by compensation that a plaintiff receives from

10   another source." *Baltimore Neighborhoods, Inc. v. Lion Gates Gardening Condominiums, Inc.*,

11   92 F. Supp. 2d 456, 465 n.9 (D. Md. 2000), *quoting Curtis v. Loether*, 415 U.S. 189, 195 (1974).

12   *Cf. Hamlin v. Charter Township of Flint*, 165 F.3d 426, 433-36 (6th Cir. 1999) ("Applying the

13   collateral source rule in the employment discrimination context prevents the discriminatory

14   employer from avoiding liability and experiencing a windfall, and also promotes the deterrence

15   functions of discrimination statutes").

16   107.    HRC's diversion of resources damages are equivalent to the "opportunity costs"

17   or the activities that HRC had to forego to address defendant's action. *See U.S. v. Balistrieri*, 981

18   F.2d 916, 933 (7th Cir. 1992); *Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990); *Fair*

19   *Housing of Marin v. Combs*, 2000 WL 365029, at *3 (N.D. Cal. Mar. 29, 2000); [Test. of Espinoza

20   at Trial Tr. vol. 2, 116:9-17].

21   108.    HRC's diversion of resource damages include compensation for: the staff time

22   spent investigating Defendants' discriminatory practices at the subject property; the costs of

23   conducting on-site tests and phone tests; and the cost of the on-site survey.  [Test. of Espinoza

24   at Trial Tr. vol. 2, 119:14-18]

25   109.    Frustration of mission damages are future costs that HRC will be forced to expend

26   to rectify the effects of Defendants' discriminatory actions. *See Fair Housing of Marin*, 2000 WL

27   365029, at *3-4, *aff'd, Fair Housing of Marin*, 285 F. 3d 899 (9th 2002) ("To recover, a fair housing

28   organization must establish that expenditures in education[], counseling and/or outreach are

1   necessary to counterbalance the effects of a defendant's discriminatory practices"). Given

2   Defendants' advertisements in the Pasadena Star News, their discriminatory statements and

3   conduct were likely to have an effect beyond Ms. Myrant and HRC's testers in this case.

4       110.      These awards seek to redress the damage that discriminatory housing practices not

5   only inflict on the mission of an organization securing housing rights, but also to the community

6   at large and can include future monitoring and testing costs, training costs and community

7   outreach costs. *See id*; *Housing Rights Center v. Snow,* 2007 WL 91148, at *2 (E.D. Cal. Jan. 3,

8   2007).

9       111.      HRC's frustration of mission damages include compensation for the costs that HRC

10  will incur to counteract Defendants' discriminatory actions. These costs include future on-site tests

11  and surveys to monitor the property; fair housing education for the subject property tenants; fair

12  housing management education for Defendants and their agents; and future advertising costs in

13  the Pasadena Star News. [Test. of Espinoza at Trial Tr. vol. 2, 116:18-21, 124:25-125:5,127:20-

14  21]

15      112.      A plaintiff fair housing organization seeking punitive damages in a fair housing case

16  must show that the Defendants acted with "reckless or callous indifference" for the fair housing

17  rights of others. *See Fair Housing of Marin*, 285 F.3d at 906-07 (*citing Smith v. Wade*, 461 U.S.

18  30, 56 (1983)); *Szwast v. Carlton Apartments,* 102 F. Supp. 2d 777, 780 (E.D. Mich. 2000)

19  (standard used for punitive damages for 1983 violations is the same for FHA violations).

20      113.      In determining whether to impose punitive damages, the fact finder will consider "an

21  evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary

22  punishment, and the advisability of a deterrent" to future illegal conduct. *Gore v. Turner*, 563 F.2d

23  159, 164 (5th Cir. 1977). The owner's direct participation in the discriminatory practice is not

24  necessary; punitive damages may be awarded where the owner ignored its duties under the law

25  or otherwise engaged in "knowledgeable inaction." *See Miller v. Apartments and Homes of New

26  Jersey, Inc.*, 646 F.2d 101, 111 (3d Cir. 1981); *Badami v. Flood*, 214 F.3d 994 (8th Cir. 2000); *see

27  also Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, (1991). Nor must the conduct be outrageous

28

1 | to warrant punitive damages. *Preferred Properties v. Indian River Estates, Inc.*, 276 F.3d 790,

2 | 799-801 (6th Cir. 2002).

3 | 114.     The Court concludes that the evidence as presented at trial does <u>not</u> support an

4 | award of punitive damages against any of the Defendants.  The Court does not believe that the

5 | actions rise to a reckless or callous indifference to the fair housing rights of others, or that punitive

6 | damages are necessary to act as a deterrent to future conduct. Rather, the trainings, surveys and

7 | monitoring to be conducted during the next three years will adequately address those needs. Nor

8 | does the Court find that the past conduct of Mr. Krug is similar enough to the instant conduct to

9 | show a pattern or practice of discriminatory behavior.

10 | 115.     Prevailing plaintiffs are entitled to reasonable attorney's fees and costs under the

11 | FHA.  42 U.S.C. § 3613(c).

12 | 116.     All statements of uncontroverted facts that are deemed to be conclusions of law are

13 | incorporated herein.

14 |

15 | **CONCLUSION**

16 |      Having considered all the evidence presented at the five-day bench trial, the Court

17 | ORDERS AND ADJUDGES AS FOLLOWS:

18 | I.          The period of this Order shall be three (3) years from its date of entry.

19 | II.         Defendants, their agents, employees, and all persons in concert or participation with any

20 | of them shall not discriminate in any aspect in the rental of dwellings in violation of the Fair

21 | Housing Act, as amended, 42 U.S.C. § 3601, *et seq.*, including but not limited to the following:

22 |                    a)     Refusing to rent or sell a dwelling, refusing or failing to provide or offer

23 |                    information about a dwelling, or otherwise making unavailable or denying a dwelling

24 |                    to any person because of race, color, religion, gender, sexual orientation, national

25 |                    origin, familial status, marital status, disability, ancestry, age, source of income or

26 |                    other characteristics protected by law;

27 |                    b)     Discouraging or encouraging prospective tenants from obtaining information

28 |                    about, viewing, applying to rent, or renting any dwelling, on the basis of race, color,

23

religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law;

c)      Discriminating against any person in the terms, conditions or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law;

d)      Misrepresenting the availability of apartments for rent on the basis of race, color, national origin, sex, handicap, familial status or religion, or providing different information about the availability of apartments on the basis of race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law;

e)      Withholding information regarding the availability of apartments for rent on the basis of race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law;

f)      Taking any action tending to constructively or actually remove or assist in the removal of any tenant from a rental unit on the basis of race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law, including but not limited to refusing to accept tendered rent payments, issuing three-day notices, filing unlawful detainer actions, or initiating any other type of legal or administrative proceeding for alleged non-payment of rent on the basis of race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law;

g)      Making, printing, publishing, or causing to be made, printed, or published any notice, statement or advertisement with respect to the rental of a dwelling that indicates any preference, limitation or discrimination on the basis of race, color,

1         religion, gender, sexual orientation, national origin, familial status, marital status,

2         disability, ancestry, age, source of income or other characteristics protected by law;

3         h)     Steering persons seeking housing to particular units on the basis of race,

4         color, religion, gender, sexual orientation, national origin, familial status, marital

5         status, disability, ancestry, age, source of income or other characteristics protected

6         by law;

7         i)     Inquiring into any prospective tenant's race, color, religion, gender, sexual

8         orientation, national origin, familial status, marital status, disability, ancestry, age,

9         source of income or other characteristics protected by law; and

10        j)     Employing overly restrictive occupancy limits that have a disparate impact on

11        families with children.

12 III.        Defendants and their employee Mr. Hebert, who is an on-site manager at the subject

13 property, are FURTHER ORDERED to undergo yearly fair housing training to be provided by the

14 Housing Rights Center for the period of this Order.[5] Persons who shall receive said training shall

15 include current and future employees of any present or future management company hired by

16 Defendants. Defendants shall pay to the Housing Rights Center its customary charge of $125 per

17 person for each such training session.

18 IV.        Within sixty (60) days of this Order, Defendants are FURTHER ORDERED to post

19 and maintain a fair housing sign in a form approved by the Secretary of HUD in all offices in which

20 they perform any business related to the rental of residential housing. *See* 24 C.F.R 110.30 ("A

21 failure to display the fair housing poster as required by this part shall be deemed prima facie

22 evidence of a discriminatory housing practice"). Defendants shall also include the words "Equal

23 Housing Opportunity Provider" or the fair housing logo in all advertising conducted and paid for

24 by Defendants in newspapers, radio, television or other media, including telephone directory

25

26

27                _____

[5]    Mr. and Ms. Hebert will not be required to receive this training if, during the three-year

28 term of this Order, they no longer are involved in the management of this or another property
owned by the other Defendants.

1  display ads, and on billboards, sign, pamphlets, brochures, and other promotional literature.

2  Those words shall be prominently placed and easily legible.

3  V.        With respect to the rental of residential dwellings of Defendants' properties and for

4  the purpose of ensuring discrimination does not continue at Defendants' properties, Defendants

5  are FURTHER ORDERED TO:

6           a)     Maintain an Availability List of all dwellings known or expected to be available

7           for rental including the date the Defendants or their agents were first informed that

8           it would be available and the first date it would be available for occupancy, the

9           number of bedrooms, the monthly rent and unit number;

10           b)     Maintain an Inquiry Log of all persons who inquire in person about the

11           availability of dwellings and/or are shown units, including the date of inquiry, and, for

12           each person who provides such information, their name, current address, and

13           telephone number.  If the person rents a dwelling, the unit number and date of

14           occupancy for that person shall be noted on the Log.  Defendants or their agents

15           shall make a good faith effort to obtain the information referred to in this paragraph

16           with respect to each prospective applicant;

17           c)     At the end of each completed Application to Rent indicate whether the

18           applicant was accepted or denied, the date the applicant was accepted or denied,

19           and the basis for denial, if denied; and

20           d)     Maintain a Waiting List of all prospective applicants who wish to be placed on

21           such a list in chronological order by date and time of inquiry.  For all prospective

22           applicants, the List shall state their names, current addresses and telephone

23           numbers, and a description of the dwelling desired.

24  VI.        Defendants shall immediately adopt and implement objective, uniform,

25  nondiscriminatory standards in renting housing units.  Such policies shall be distributed

26  immediately to all of Defendants' tenants and agents in Los Angeles County, California and shall

27  be distributed to all of Defendants' future tenants and agents at Defendants' residential rental

28  properties in Los Angeles County, California for the period of this Order.  The specific language

1   of the nondiscriminatory policy shall be: "It is the policy of the owners and managers of

2   _____ [list each applicable property] not to discriminate against anyone in any aspect

3   of the rental of dwellings because of race, color, national origin, sex, handicap, familial status or

4   religion. This policy means, among other things, that all agents must: (a) always truthfully provide

5   any person who inquires about an apartment for rent a reasonable number of apartments available

6   for rent that meet the person's stated criteria; (b) never select, choose, recommend or suggest a

7   particular apartment to anyone; (c) never fail to inform someone of an available apartment; (d)

8   never discourage anyone from renting an apartment; (e) never provide varying and/or untrue

9   information about the availability and/or price of a unit; and (f) never provide or withhold tenant

10   services, repairs or amenities because of a person's race, color, national origin, sex, handicap,

11   familial status or religion.

12   VII.          Defendants are ORDERED to pay HRC compensatory damages of $ 6,590.80 for

13   diversion of resources and $ 29,065.32 for frustration of mission.

14   VIII.          Plaintiff is the prevailing party in this action and is therefore entitled to reasonable

15   attorney's fees and costs.  Plaintiff's motion for fees and costs, and its memorandum of non-

16   taxable costs, shall be made within fourteen (14) days of entry of judgment herein.  Defendants'

17   opposition to said motion shall be filed within fourteen (14) days of service of plaintiff's motion.

18

19   IT IS SO ORDERED.

20

21

22   DATED: October 12 , 2007

23                                                          PAUL L. ABRAMS
                                                            UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28